# In the United States Court of Federal Claims

## OFFICE OF SPECIAL MASTERS
### No. 14-1072V
### (To be Published)

```
* * * * * * * * * * * * * * * * * * * * * * * *
CANDI GONZALEZ, Natural Mother and    *    Filed: November 10, 2015
Guardian for M. A-S. M., a minor,     *
                                      *
              Petitioner,             *    Attorney's Fees and Costs;
     v.                               *    Reasonable Basis;
                                      *    Washington, DC Forum Rate;
SECRETARY OF HEALTH                   *    New Jersey Local Rate;
AND HUMAN SERVICES,                   *    Paralegal Hourly Rate; Attorney
                                      *    Hourly Rate; Expert Hourly Rate.
              Respondent.             *
                                      *
* * * * * * * * * * * * * * * * * * * * * * * *
```

*Carol L. Gallagher*, Carol L. Gallagher, Esquire, LLC, Linwood, NJ, for Petitioner.

*Ryan D. Pyles*, U.S. Dep't of Justice, Washington, DC, for Respondent.

## ATTORNEY'S FEES AND COSTS DECISION[1]

On November 4, 2014, Candi Gonzalez filed a petition on behalf of her minor child, M. A-S. M., for compensation in the National Vaccine Injury Compensation Program ("Vaccine Program"),[2] alleging that the vaccines administered to M. A-S. M. on March 28, 2012, caused her to develop pertussis, speech delay, and other symptoms. ECF No. 1. A little more than six months later, on May 26, 2015, Petitioner filed an unopposed motion requesting dismissal of this case (Pet'r's Mot. for Decision Dismissing her Pet. (ECF No. 18)), which I granted (ECF No. 19).

---

[1] Because this decision contains a reasoned explanation for my actions in this case, I will post it on the United States Court of Federal Claims website, in accordance with the E-Government Act of 2002, Pub. L. No. 107-347, § 205, 116 Stat. 2899, 2913 (Dec. 17, 2002) (current version at 44 U.S.C. § 3501 (2014)). As provided by 42 U.S.C. § 300aa-12(d)(4)(B), however, the parties may object to the published decisions inclusion of certain kinds of confidential information. Specifically, under Vaccine Rule 18(b), each party has fourteen days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). Otherwise, the whole decision will be available to the public. *Id.*

[2] The Vaccine Program comprises Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3758, codified as amended, 42 U.S.C. §§ 300aa-10 through 34 (2012) ("Vaccine Act" or "the Act"). Individual section references hereafter will be to § 300aa of the Act (but will omit the initial statutory prefix).

Petitioner has now filed an application for attorney's fees and costs. ECF No. 24. Respondent opposes the fees request, on the grounds that reasonable basis was lacking and that the magnitude of requested fees and costs is unreasonable. As discussed below, I hereby grant in part and deny in part Petitioner's request for attorney's fees and costs, finding that although reasonable basis for filing of this matter exists, the sum of requested fees and costs should be reduced. In her application for attorney's fees and costs, Petitioner requested $30,198.75 in attorney's fees for Carol L. Gallagher, Esq. (which represents 15.35 hours billed at an hourly rate of $300 per hour and 78.75 hours billed at an hourly rate of $325 per hour), $3,251.54 for costs paid for by Ms. Gallagher, and $437 for other incurred costs. ECF No. 27. I hereby award Petitioner $24,213.98 in attorney's fees, $2,551.54 in costs paid for by counsel, and $437 in Petitioner's incurred costs.

## I.      Factual and Procedural Background

### A.      *Facts Pertaining to Petitioner's Case*

On March 28, 2012, M. A-S. M. (then two months old) received a number of vaccinations, including hepatitis B, rotavirus, pneumococcal, and combined diphtheria-tetanus acellular-pertussis ("DTaP"), haemophilus influenza b ("Hib"), and inactivated poliovirus ("IPV"). Pet'r's Ex. 4 at 4, 7-8 (ECF No. 8-4 at 5, 8-9). Petitioner's affidavit asserts that post-vaccination M. A-S. M. became irritable and not herself, but Petitioner was informed by her pediatrician that these were expected side effects of the vaccines. Aff. at 8 (Pet'r's Ex. 1). Twenty-five days later, on April 22, 2012, M. A-S. M. was taken to the hospital after several days of coughing and rhinitis. Pet'r's Ex. 8 at 15 (ECF No. 8-8 at 16). Not long thereafter she was diagnosed as having acute bronchiolitis, for which she was prescribed a nebulizer and symptomatic therapy was suggested. Pet'r's Ex. 4 at 8 (ECF No. 8-4 at 9).

A week later, M. A-S. M. was taken back to the hospital by Ms. Gonzalez after experiencing a repeat of her prior symptoms, plus new breathing difficulties. *See, e.g.*, Pet'r's Ex. 8 at 12-14 (ECF No. 8-8 at 13-15). Such concerns did not dissipate in the ensuing period of time, resulting in additional hospital visits. Pet'r's Ex. 6 at 6 (ECF No. 8-6 at 8). By May of 2012, M. A-S. M.'s bronchiolitis continued, and she was ultimately admitted as an inpatient to a hospital in Madison, Wisconsin for further monitoring and evaluation. Pet'r's Ex. 7 at 6 (ECF No. 8-7 at 7); *see also* Pet'r's Ex. 13 (ECF No. 17-1 at 8) at 7. After her hospitalization, M. A-S. M. tested positive for pertussis, which was treated with appropriate medication. Pet'r's Ex. 7 at 10 (ECF No. 8-7 at 11); Pet'r's Ex. 4 at 11 (ECF No. 8-4 at 12).[3]

---

[3] Hospital records from May 3, 2012, indicated that the "[p]ertussis swab came back positive, so [M. A-S. M.] will be treated with azithromycin. Her CBC on admission showed leukocytosis with high lymphocytes and she has remained afebrile, which would be consistent with pertussis." Pet'r's Ex. 13 at 13 (ECF No. 17-1 at 14).

M. A-S. M. continued to be seen in the months thereafter by her pediatrician for treatment of her persistent symptoms (still believed to be related to her pertussis infection), although she did improve somewhat. Pet'r's Ex. 4 at 12 (ECF No. 8-4 at 13). Notably, however, at no point in the time period between M. A-S. M.'s alleged reaction to her March 28, 2012, vaccinations and the end of May of that same year did any treating physician postulate that the vaccinations had played a role in her illness. Indeed, M. A-S. M. received additional vaccinations at the end of May of 2012. *Id.* at 13 (ECF No. 8-4 at 14).

When M. A-S. M. saw her pediatrician again on June 14, 2012, her diagnosis was altered to acute bronchitis, after testing for pertussis came back negative. Pet'r's Ex. 9 at 4-5 (ECF No. 9-1 at 5-6). Her parents continued to monitor her condition closely, but by early September of 2012, her condition was steadily improving, and she received additional vaccinations at that time (including the combined DTaP/HIP/IPV vaccine). Pet'r's Ex. 4 at 4, 16 (ECF No. 8-4 at 5, 17).

In April of 2013 (about a year after the vaccinations alleged to have instigated M. A-S. M.'s illness), Ms. Gonzalez brought M. A-S. M. back to her pediatrician for treatment of a harsh cough accompanied by nasal discharge, which had still not fully resolved since the summer of 2012. Pet'r's Ex. 4 at 18 (ECF No. 8-4 at 19). At that time, M. A-S. M.'s parents also expressed concerns about her speech because she was reportedly using only three words, and inquired about the possibility that her persistent cough and ongoing pertussis-like symptoms might be related to her prior vaccinations. *Id.* at 18 (ECF No. 8-4 at 19). The pediatrician confirmed that M. A-S. M. displayed speech delay. *Id.* at 19 (ECF No. 8-4 at 20). Petitioner and her husband reiterated such developmental concerns at a subsequent pediatric visit in September of 2013, although M. A-S. M. again received immunizations at that visit. *Id.* at 19-20 (ECF No. 8-4 at 20-21).

Since then, M. A-S. M.'s developmental problems have been confirmed (although never linked by any treater to any prior vaccinations she received). Pet'r's Ex. 10 (ECF No. 11-1 at 4, 13) at 3, 12. With respect to her prior pertussis-like symptoms, M. A-S. M. has had occasional flare-ups of coughing and related respiratory problems but they have been treated without long-term effects, and there is no other indication in the medical record that she has experienced any notable or persistent illness that could be consistently linked to her immediate post-vaccination symptoms. *See, e.g.*, Pet'r's Ex. 12 at 4, 6-9 (ECF No. 15-1 at 5, 7-10).

B.    *Procedural History*

1.    <u>Time Spent Working on Case</u> - Because this is a request for attorney's fees and costs, it is helpful to review the procedural history of the case in light of counsel's contemporaneous actions in the matter, as reflected in the attorney invoices submitted with this fees application. Ms. Gonzalez filed her petition on November 4, 2014. ECF No. 1. However,

Petitioner initiated contact with her counsel, Ms. Gallagher, nearly a year before, on January 2, 2014. Pet'r's Ex. A (ECF No. 27-1 at 2). Thus, prior to filing the petition in November of 2014, Ms. Gallagher had already spent 33.35 hours working on this matter. *Id.* at 2-4.

The filed billing records reveal that counsel performed, among other things, the following tasks prior to filing the petition:

- *Communication with Petitioner* – Ms. Gallagher spent approximately 14.95 hours communicating with Petitioner before this case was filed. Pet'r's Ex. A at 2-6;

- *Communication with third parties* – Ms. Gallagher devoted approximately 2.7 hours to communicating with treatment providers in an attempt to obtain medical records relevant to Petitioner's claim. *Id.*;

- *Review of medical records* – Ms. Gallagher spent approximately 4.75 hours reviewing medical records after receiving those records from treatment providers. *Id.*;

- *Research and review of scientific or medical literature* – Ms. Gallagher spent approximately 3.85 hours researching Petitioner's claim in this case, including conducting research on the DTaP vaccination (e.g., ingredients in the vaccination, reactions to the vaccination, etc.) and pediatric apnea. *Id.* In the course of her investigation, she identified literature that "appeared to support a causal connection between the multitude of vaccines administered on March 28, 2012 and the consequent maladies suffered by [M. A-S. M.]." Pet'r's Resp. to Resp't's Opp. to the App. for Fees & Costs at 6 (ECF No. 26 at 6) ("Reply").

  Based on materials filed with the present fees petition, it appears that one of the articles uncovered while performing this initial research pertained to an animal study showing that Bordetella parapertussis[4] could develop even after administration of the acellular form of the pertussis vaccine.[5] Pet'r's

---

[4] Bordetella pertussis is "the usual cause of pertussis (whooping cough)" (*Dorland's Illustrated Medical Dictionary* (32d ed. 2012) at 240) ("*Dorland's*"). Bordetella parapertussis is "the other major etiological agent of human whooping cough." Pet'r's Ex. 15 (Grainne H. Long, Alexia T. Karanikas, Eric T. Harvill, Andrew F. Read, & Peter J. Hudson, *Acellular pertussis vaccination facilitates Bordetella parapertussis infection in rodent model of bordetellosis,* Proc. R. Soc. B (2011)).

[5] Currently, all commercially available whooping cough vaccines contain either killed whole cells or purified antigens of Bordetella pertussis – referred to as the whole cell and acellular vaccines respectively, with reduced reactogenicity seen with the acellular version of the vaccine. Pet'r's Ex. 15.

Ex. 15 (Grainne H. Long, Alexia T. Karanikas, Eric T. Harvill, Andrew F. Read, & Peter J. Hudson, *Acellular pertussis vaccination facilitates Bordetella parapertussis infection in rodent model of bordetellosis*, Proc. R. Soc. B (2011). Petitioner has also filed a synopsis of that article published in the Proceedings of Royal Society Biological Sciences in 2010, which states that the acellular vaccine "may have contributed to the observed increase in whooping cough over the last decade." Pet'r's Ex. 14 (ECF No. 26-1) (Alexia Karanikas, *Acellular pertussis vaccination enhances B. parapertussis colonization*, Center for Infectious Disease Dynamics      at      The      Pennsylvania      State      University, http://www.cidd.psu.edu/research/synopses/acellular-vaccine-enhancement-b.-parapertussis).

In the months following the initiation of this case, Ms. Gonzalez filed medical records in support of her claim, as well as an affidavit regarding the onset of M. A-S. M.'s alleged vaccine-related injury (Aff. at 8 (Pet'r's Ex. 1)). After the parties agreed the record was substantially complete, Respondent filed her Rule 4(c) report on March 2, 2015, asserting that the case was not appropriate for compensation because Petitioner could not establish that the acellular pertussis vaccine (which does not contain the live bacteria) could cause the illnesses complained of by Petitioner; indeed, Respondent noted, M. A-S. M. received the pertussis vaccine three additional times following receipt of the pertussis vaccination at issue in this case without suffering any ill effect. Rule 4(c) Report (ECF No. 13) at 2-4. For these reasons, Respondent also questioned whether Petitioner had a reasonable basis for her claim. *Id.* at 4.

Thereafter, I ordered Petitioner to file an expert report in support of her petition by June 1, 2015. Non-PDF Scheduling Order Regarding Status Conference on Apr. 2, 2015. Around this time, the billing records reveal that Petitioner's counsel spoke with David Axelrod, MD (an expert in the field of immunology who has testified in Vaccine Program cases on numerous occasions) to discuss the case. Reply at 2. Petitioner subsequently continued to work to obtain medical records requested by Dr. Axelrod to evaluate her claim. *Id.* However, after Petitioner's counsel received an unfavorable reaction to the claim from Dr. Axelrod, she contacted her client[6] and soon thereafter filed a motion seeking dismissal of this case on May 26, 2015, asserting that Petitioner did not believe she would be able to carry her burden of proof (Pet'r's Mot. for Decision Dismissing her

---

[6] On April 13, 2015, Petitioner was still waiting to receive outstanding medical records (which had been previously requested on a number of occasions) that Dr. Axelrod believed to be pertinent to her claim in this case. Reply at 2-3. Those medical records were finally received by Petitioner on May 4, 2015, and they were filed with the Court on the following day. *Id.* After several communications with Dr. Axelrod in the ensuing days, Petitioner's counsel "received her report from Dr. Axelrod and immediately contacted Ms. Gonzalez to discuss the fact that [in Petitioner's counsel's view] [P]etitioner no longer had a reasonable basis to continue in the [V]accine [P]rogram." *Id.* Accordingly, Petitioner agreed that a motion to dismiss her claim in this case could be filed on May 18, 2015, and that motion was subsequently prepared by Petitioner's counsel and filed on May 26, 2105. *Id.* at 3.

Pet. (ECF No. 18)). Reply at 2. After my own review of the record, and based in part on Respondent's acquiescence to the motion, I issued a decision dismissing the case for insufficient proof on June 3, 2015 (ECF No. 19).

2.    Fees Petition - On June 16, 2015, Petitioner filed the present application requesting $26,022.50 in attorney's fees, $3,251.54 in costs paid by counsel, and $437 in costs incurred by Petitioner. ECF No. 24 at 2. Petitioner asks that Ms. Gallagher receive $300 per hour for 15.35 hours of work performed before August 2014, and $325 per hour for 65.9 hours of work performed after that date. *Id*. Petitioner also provided substantiation for her requested litigation costs, including the petition filing fee ($400), money paid to Dr. Axelrod for his review and initial preparation of an expert report for this case ($2,500), and the costs of obtaining medical records ($351.54). *Id*.

On June 23, 2015, Respondent opposed the fees request. *See generally* Opp. to Pet'r's App. for Fees & Costs (ECF No. 25) ("Opp."). The opposition reiterates Respondent's earlier assertion from her Rule 4(c) report that the matter lacks reasonable basis, and further argues that even if Petitioner's request is not denied in its entirety, the total sum awarded should be curtailed. Opp. at 1. Along with her Opposition, Respondent filed materials supporting her argument, including: (i) the 2014 Real Rate Report ("RRR"), which provides information regarding attorneys' hourly rates (Resp't's Ex. A); (ii) a publication entitled "the Real Cost of Living in New Jersey," which provides information regarding the costs of living in New Jersey (Resp't's Ex. B); (iii) an annotation of Ms. Gallagher's billing records, dividing the time she billed into six different categories (Resp't's Ex. C); and (iv) information from Dr. Axelrod's website, which describes his background and experience in the Vaccine Program (Resp't's Ex. D).

Petitioner filed a reply in further support of the fees petition on July 2, 2015, arguing that there was a reasonable basis for filing the petition, and that the fees and costs requested are otherwise reasonable.[7] Reply at 1. In addition to and in support of her response, Petitioner filed two articles that she purports provide support for the underlying theory in this case that even the acellular form of the pertussis vaccine could nevertheless potentially cause a form of pertussis. *See, e.g.*, Pet'r's Exs. 14 (a synopsis of the aforementioned article written by one of the individuals

---

[7] Concurrent with the filing of the Reply, Petitioner also filed a motion to amend her pending fees application. Am. App. for Fees & Costs, dated July 2, 2015 (ECF No. 27). In the motion, Petitioner amended upward her prior request for attorney's fees to $30,198.75, reflecting an additional 12.85 hours of work that Ms. Gallagher performed in addressing the subject of attorney's fees and costs. *Id.* at 2. The amount of costs paid by counsel ($3,251.54) and un-paid costs ($437) remained unchanged. *Id.* Accordingly, the total fees and costs now claimed by Petitioner is $33,887.29. ECF No. 27. Respondent opposed this motion to amend on July 20, 2015, reiterating her prior arguments in opposition to the original fees application. Resp. to Am. App. for Fees & Costs (ECF No. 28). As subsequently discussed in more detail, Respondent also specifically addressed the documents that Petitioner utilized to provide additional support for her counsel's requested hourly rate. *Id.* at 1-2.

involved in the original research) and 15. She also filed the United States Consumer Law Attorney Fee Survey Report from 2013 through 2014 (Pet'r's Ex. 15A), which set forth hourly rates charged by attorneys in different areas of the country during that period of time, plus the affidavits of two attorneys representing that Ms. Gallagher's hourly rate is reasonable (Pet'r's Exs. 17-18). The matter is now ripe for resolution.

## II.      Specific Issues Raised by Petitioner's Fees and Costs Application

In Vaccine Act cases, special masters have the authority to award "reasonable" attorney's fees and litigation costs. Section 15(e)(1). Although successful petitioners are entitled by statute to such an award, even petitioners who have not been successful on the merits of their claim may receive a fees award if they can establish that "the petition was brought in good faith and there was a reasonable basis for the claim." *Sebelius v. Cloer*, 133 S. Ct. 1886, 1893 (2013). Special masters are afforded significant discretion in determining whether attorney's fees are appropriate to award to an unsuccessful petitioner. *See Chuisano v. United States*, 116 Fed. Cl. 276, 285 (2014) (emphasizing the "distinction between an automatic fee award for successful petitioners and a discretionary award for unsuccessful petitioners"). But in all cases the fees requested must be reasonable. Section 15(e)(1).

It is within the discretion of the special master to make determinations regarding the reasonableness of a requested fees award. *See Perreira v. Sec'y of Health & Human Servs.*, 27 Fed. Cl. 29, 34 (1992), *aff'd*, 33 F.3d 1375 (Fed. Cir. 1994). To this end, special masters may reduce hours *sua sponte*, apart from objections raised by Respondent and without providing a petitioner notice and opportunity to respond. *See Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 208-09 (2009); *Perreira*, 27 Fed. Cl. at 34 (special master has "wide discretion in determining the reasonableness" of attorney's fees and costs).

As noted above, Respondent opposes Petitioner's fees request on a number of grounds. At the outset, Respondent maintains that this case never had a reasonable basis for being filed,[8] as a rudimentary investigation of the claim would have revealed that it had no viability. Opp. at 3-15. Alternatively, Respondent argues that even if an award of attorney's fees and costs is appropriate, the requested sum is unreasonable and should be reduced. *Id.* at 15-26. Respondent in particular argues that in a case such as this one, where the petition was voluntarily dismissed not long after Respondent filed her Rule 4(c) report, the awarded fees should be much less than what Petitioner is requesting. *Id.* at 15-18. Respondent attributes the excessiveness of the fees to Petitioner's counsel having charged an unreasonable hourly rate and having billed an unreasonable number of hours. *Id.* at 18-25. Respondent also objects to the costs arising from Dr. Axelrod's involvement in the matter. *Id.* at 25-26.

---

[8] Respondent does not contest that the claim was filed in good faith, and I see no basis from the record to conclude otherwise.

A.     *Reasonable Basis for Petitioner's Claim*

Reasonable basis is not specifically defined by the Vaccine Act (or Rules) nor has it been defined by the Federal Circuit. *See Chuisano*, 116 Fed. Cl. at 285. In *Chuisano*, the United States Court of Federal Claims noted that "[a] 'reasonable basis' standard that is not rigidly defined—as amorphous as it may be—is consistent with the Vaccine Act as a whole," which was intended "to award compensation 'to vaccine-injured persons quickly, easily, and with certainty and generosity,'" and which features a generous attorney's fees provision in keeping with that intent. *Id.* (internal citations omitted). Thus, in attempting to carry out such policy goals, special masters have tended to be lenient when determining whether a claim has a reasonable basis. *Austin v. Sec'y of Health & Human Servs*, No. 10–362V, 2013 WL 659574, at *8 (Fed. Cl. Spec. Mstr. Jan. 31, 2013).[9]

Despite the above, it is well understood that an objective standard based on the totality of the circumstances should be employed when evaluating reasonable basis. *McKellar v. Sec'y of Health & Human Servs.*, 101 Fed. Cl. 297, 303-04 (2011); *see also Chuisano*, 116 Fed. Cl. at 285. In establishing a reasonable basis for the claim, a "petitioner must rely on more than speculation." *McKellar*, 101 Fed. Cl. at 303-05 (citing *Perreira*, 33 F.3d at 1377) ("unlike good faith, there is no presumption of a petition's reasonableness;" and therefore "[t]he petitioner must affirmatively establish a reasonable basis to recover attorneys' fees and costs")). However, preponderant evidence is not required to establish the reasonable basis of a petitioner's claim. *Chuisano*, 116 Fed. Cl. at 287.

The inquiry into a claim's reasonable basis thus centers "not [on] the likelihood of success [of a claim] but more [on] the feasibility of the claim." *Di Roma v. Sec'y of Health & Human Servs.*, No. 90–3277V, 1993 WL 496981, at *1 (Fed. Cl. Spec. Mstr. Nov. 18, 1993). Other special masters have looked to whether a claim has support in the contemporaneous medical records and/or a medical opinion, or if the petitioner can demonstrate at least that "fundamental inquiries" were made to locate evidentiary support for the claim. *Melbourne v. Sec'y of Health & Human Servs.*, No. 99-694V, 2007 WL 2020084, at *6 (Fed. Cl. Spec. Mstr. June 25, 2007); *Di Roma*, 1993 WL 496981, at *2.

---

[9] Such lenient application of reasonable basis has been deemed especially appropriate when a non-death case petition is filed near the expiration of the three-year statute of limitations period. Section 16(a)(2); *Austin v. Sec'y of Health & Human Servs.*, No. 10-362V, 2012 WL 592891, at *9 (Fed. Cl. Spec. Mstr. Jan. 24, 2012). Under such circumstances, reasonable basis has been found to exist even though no medical records or medical opinions supporting vaccine causation were ever filed. 2012 WL 592891, at *8. This does not mean, however, that all claims filed at the close of the limitations period presumptively possess a reasonable basis. *See Chuisano*, 116 Fed. Cl. at 286 ("[i]f Congress had intended all or nearly all petitioners to recover fees, it easily could have expanded fee awards to all petitions filed in good faith, rather than requiring good faith and a reasonable basis."). And even where there is a reasonable basis for a claim at the time of filing, that reasonable basis can cease to exist as the case progresses. *Perreira*, 33 F.3d at 1377.

The scope and sufficiency of an attorney's pre-filing investigation into a petitioner's claim accordingly bears on its reasonable basis. *See Cortez v. Sec'y of Health & Human Servs.*, No. 09-176, 2014 WL 1604002, at *6 (Fed. Cl. Spec. Mstr. Mar. 26, 2014); *Di Roma*, 1993 WL 496981, at *2 (citing *Lamb v. Sec'y of Health & Human Servs.*, 24 Cl. Ct. 255, 258-59 (1991)). Vaccine Program attorneys are expected to conduct a reasonable pre-filing investigation under the circumstances of the case. *See Turner v. Sec'y of Health & Human Servs.*, No. 99-544V, 2007 WL 4410030, at *6-7 (Fed. Cl. Spec. Mstr. Nov. 30, 2007). In those cases "when an attorney fails to properly investigate a claim before filing the petition, despite adequate time to do so, the petition may lack a reasonable basis." *Dews by Brown v. Sec'y of Health & Human Servs.*, No. 13-569V, 2015 WL 1779148, at *5 (Fed. Cl. Spec. Mstr. Mar. 30, 2015) (citing *Chuisano*, 116 Fed. Cl. at 286, 291). At bottom, counsel should not "game the system" in an effort to take advantage of the Vaccine Act's generous attorney's fees provisions and thus intentionally "delay investigation until after filing a non-meritorious petition so that they may receive fees for the investigation." *Dews by Brown*, 2015 WL 1779148, at *5; *Everett v. Sec'y of Health & Human Servs.*, No. 91-1115V, 1992 WL 35863, at *2 (Cl. Ct. Feb. 7, 1992) (refusing to award even investigatory costs "incurred in connection with a petition which should never have been filed.").

As the fees decisions of other special masters reveal, evidence that counsel has not made good use of pre-filing investigatory time can be fatal to a fees request. *See, e.g.*, *Silva v. Sec'y of Health & Human Servs.*, 108 Fed. Cl. 401 (2012). In *Silva*, the Court of Federal Claims affirmed a special master's finding that a petition lacked reasonable basis at the time it was filed. 108 Fed. Cl. at 405. Counsel had been responsible for the case for seventeen months before filing the petition, but petitioner's allegation that she suffered from transverse myelitis ("TM") remained unsubstantiated or contradicted by other information in the medical records, such as the fact that her MRIs were normal and none of her treating doctors ever proposed that the vaccine had caused her to suffer TM. *Id.*

Here, Respondent makes several points in support of her argument that Ms. Gonzalez's claim lacks reasonable basis. Preliminarily, Respondent notes that an impending statute of limitations was never an issue in this case (given that M. A-S. M. received the vaccines at issue in March of 2012, approximately two-and-one-half years before filing). Opp. at 13. This is plainly correct – and in any event, as the billing records reveal, counsel began work on the case nearly a year before it was filed (ECF No. 25-3 at 2). Accordingly, Petitioner and her counsel had ample time pre-filing to investigate the claim.

Respondent next argues that M. A-S. M.'s alleged vaccine injury should have been understood to be legally deficient from the start. A rudimentary inquiry, she maintains, would have demonstrated to Ms. Gonzalez and her counsel that an acellular vaccine like DTaP containing no live bacterium could not possibly produce the very infection the vaccine was intended to prevent (pertussis) and thus the case never had a reasonable basis. Opp. at 3, 13-14. Further, Respondent

contends that the very novelty of the claim – there appear to be no published decisions where the acellular pertussis vaccine is alleged to have caused an actual pertussis infection – "should have put [P]etitioner on notice about the dubious nature of the allegation." *Id*. at 14.[10]

In an effort to rebut these assertions and establish reasonable basis,[11] Petitioner points to the existence of literature discussing an animal study that, she argues, lends some scientific support to her contention that the pertussis vaccine, despite its acellular nature, could have caused M. A-S. M.'s symptoms. Reply at 5-6 (citing Pet'r's Exs. 14 and 15). Petitioner also notes that she uncovered this literature in advance of the filing of the petition, and that the claim otherwise meets the basic requirements of a valid Vaccine Program claim (e.g., involves a Table vaccine that was unquestionably administered, and resulted in injuries lasting more than six months). Reply at 5. Petitioner has filed the relevant medical literature along with a synopsis of the actual research article describing the underlying study. Pet'r's Exs. 14 and 15. As the synopsis (which was written by a graduate student involved in the original research) indicates, "the mechanism behind this increased colonization [of bordetella parapertussis] was not specifically elucidated, [but] it is speculated to involve specific immune responses skewed or dampened by the acellular vaccine, including cytokine and antibody production during infection." *Id*.

Based on my review of this case and the materials filed in connection with it, it is evident that Ms. Gonzalez's claim was not strong at the outset. I have identified no prior instances in which a petitioner unsuccessfully (or successfully) attempted to link the acelllular pertussis vaccine to the development of an actual pertussis infection (or pertussis-like symptoms). I also have some concern about the amount of time that counsel possessed the case prior to its filing. Communication with a potential expert prior to filing could have exposed the claim's lack of sufficient scientific foundation sooner.

Nevertheless, I find under present circumstances that there were sufficient grounds for the claim's filing. Before the case was filed, Petitioner's counsel identified relevant literature supporting the claim she ultimately filed. In addition, the bare facts of the case as reflected in the

---

[10] Respondent also argues that the claim more generally lacked reasonable basis based on the medical records because: (a) the records do not support a medically acceptable temporal relationship to the vaccination; (b) no treaters pointed to the DTaP, or any other vaccine M. A-S. M. received, as the likely cause of her pertussis symptoms; and (c) M. A-S. M. received additional pertussis immunizations thereafter but suffered no similar reaction as alleged in this case. Opp. at 14.

[11] Petitioner also generally maintains that Ms. Gallagher has represented numerous petitioners in Vaccine Program cases over the years but has never been denied attorney's fees and costs due to lack of good faith and reasonable basis, and otherwise has never been accused of "gaming" the system in order to receive a fees award for an obviously meritless claim. Reply at 7. I have no basis to question Ms. Gallagher's competency or ethics under the present circumstances, nor have I seen any questions about her set forth in any prior Vaccine Program-related ruling or decision. But these are not the sort of objective factors about the claim itself that are relevant to whether in *this case* reasonable basis is present.

records – the unquestioned March 2012 vaccination, along with the onset of M. A-S. M.'s symptoms not long after receipt of the March 2012 vaccines – also support the claim's feasibility.[12]

The Vaccine Program aims to encourage counsel to take cases even when they are unique and present complex issues of science and fact. *See, e.g.*, *Goodridge v. Sec'y of Health & Human Servs.*, No. 02-320V, 2014 WL 3973905, at *6 (Fed. Cl. Spec. Mstr. May 20, 2014). Had it been obvious from some basic legal research that Petitioner's claim was deficient (for example, due to the existence of unfavorable case law involving the same causal theory Petitioner expected to pursue), it would be easier to conclude that a careful practitioner would not have filed the matter at all. But the record shows that Petitioner's counsel did attempt to investigate the claim before filing, and made the determination to withdraw after consultation with an expert. I find that such circumstances are enough, given the purposes of the Vaccine Program's fees provision, to find there was reasonable basis for the claim's filing.[13]

B.    *Hourly Rate for Ms. Gallagher*

The Federal Circuit has endorsed use of the lodestar approach when determining what constitutes reasonable attorney's fees under the Vaccine Act. *Avera v. Sec'y of Health & Human Servs.*, 515 F.3d 1343, 1347-48 (Fed. Cir. 2008). Utilizing this approach, a special master first designates a reasonable hourly rate for the attorney in question, and then multiplies it by the number of hours that the attorney reasonably expended on the litigation. *Avera*, 515 F.3d at 1347-48. After making this initial calculation, a special master may make an "upward or downward departure to the fee award based on other specific findings." *Id.* at 1348. However, there is a presumption that following this procedure results in a reasonable fees award, which may "only be overcome in those rare circumstances in which the lodestar does not adequately take into account a factor that may properly be considered in determining a reasonable fee." *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 554 (2010) (internal quotations omitted). In requesting attorney's fees, the petitioner in a Vaccine Program case bears the burden of providing evidence to support the reasonableness of the attorney's hourly rate. *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983); *Sabella v. Sec'y of Health & Human Servs.*, 86 Fed. Cl. 201, 211 (2009); *Rupert v. Sec'y of Health & Human Servs.*, 52 Fed. Cl. 684, 686 (2002).

As the Supreme Court explained in *Blum v. Stetson*, the "reasonable hourly rate" is the "prevailing market rate" in the relevant forum, meaning the rate charged "in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." 465 U.S.

---

[12] In addition, although the pertussis vaccine became the focus of the case, M. A-S. M. received several vaccines at her two-month pediatric visit. Any of those vaccines, alone or in combination, could have caused the symptoms she later experienced, and thus the fact that the pertussis vaccine might not seem at first glance to likely cause pertussis did not necessarily lead to the conclusion at the time of the case's filing that it lacked a reasonable basis.

[13] Once Dr. Axelrod informed Ms. Gallagher in April of this year that he could not offer expert support for the claim, however, reasonable basis ceased to exist – but counsel promptly sought dismissal of the case immediately thereafter.

886, 895 n. 11 (1984). The relevant forum in Vaccine Program cases is always the District of Columbia (regardless of the location of the hearing or the other portions of the case), and the reasonable hourly rate should generally be based on the forum rate. *Avera*, 515 F.3d at 1349; *see also Davis Cnty. Solid Waste Mgmt. & Energy Recovery Special Serv. Dist. v. U.S. E.P.A.*, 169 F.3d 755 (D.D.C. Feb. 26, 1999). However, an exception to the forum rule (often referred to as the *Davis County* exception) is applied in cases where the majority of the attorney's work is performed outside of the forum, and where there is a "very significant difference" in compensation between the forum rate and the local rate. Under such circumstances, when the forum rate is higher, the reasonable hourly rate for the attorney's fees award should be calculated utilizing the lower local rate.[14] *See Avera*, 515 F.3d at 1349.

A special master may utilize evidence submitted by a petitioner, as well his own judgment and experience, when making determinations regarding the reasonable hourly rate for an attorney.[15] *King v. Sec'y of Health & Human Servs.*, No. 03–584V, 2010 WL 5470787, at *4 (Fed. Cl. Spec. Mstr. Dec. 13, 2010); *Broekelschen v. Sec'y of Health & Human Servs.*, No. 07–137V, 2008 WL 5456319, at *7 (Fed. Cl. Spec. Mstr. Dec. 17, 2008). Affidavits from other attorneys regarding their hourly rate can be useful in making determinations regarding what constitutes a reasonable hourly rate. The significance afforded to such affidavits must, however, be tempered by the fact that attorneys are not disinterested observers, but personally invested in maintaining high rates in the legal profession. *Masias v. Sec'y of Health & Human Servs.*, No. 99–697V, 2009 WL 1838979, at *27 (Fed. Cl. Spec. Mstr. June 12, 2009), *aff'd*, 634 F.3d 1283 (Fed. Cir. 2011), *order corrected*, 99–697V, 2013 WL 680760 (Fed. Cl. Spec. Mstr. Jan. 30, 2013).

With the above in mind, a reasonable hourly rate for Ms. Gallagher can be determined. Certain relevant facts are not disputed. Ms. Gallaher has been a member of the New Jersey Bar since December 19, 1995, and (beginning in November of 2006) has been attorney of record in approximately fifty-eight Vaccine Program cases. Indeed, according to her website, Ms. Gallagher is a solo practitioner who devotes the majority of her legal practice to Vaccine Program litigation. More significantly for present purposes, the parties do not dispute that Ms. Gallagher performed almost all of the work in this case from her law office in Linwood, New Jersey (which is located in Atlantic County, New Jersey, southeast of the Philadelphia, Pennsylvania metropolitan region).

---

[14] Special masters have discretion in determining whether there is a "very significant" difference between the forum and local rates. *See, e.g., Hall v. Sec'y of Health & Human Servs.*, 640 F.3d 1351, 1354 (Fed. Cir. 2011) (finding a difference of 59 percent to be very significant); *Barrett v. Sec'y of Health & Human Servs.*, No. 09–389V, 2014 WL 2505689, at *16 (Fed. Cl. Spec. Mstr. May 13, 2014) (finding a difference of 38 percent to be very significant); *Sabella v. Sec'y of Health & Human Servs.*, No. 02-1627V, 2008 WL 4426040, at *5 (Fed. Cl. Spec. Mstr. Sept. 23, 2008) (finding a difference of 49 percent to be very significant).

[15] Court decisions regarding what constitutes a reasonable hourly rate are also relevant, even though even decisions made by other special masters (whether regarding lodestar calculations or other matters) are not binding on the special master (though they can be persuasive). *Guillory v. Sec'y of Health & Human Servs.*, 59 Fed. Cl. 121, 124 (2003), *aff'd*, 104 Fed. Appx. 712 (Fed. Cir. 2004); *Hanlon v. Sec'y of Health & Human Servs.*, 40 Fed. Cl. 625, 630 (1998), *aff'd in non-rel. part*, 191 F.3d 1344 (Fed. Cir. 1999).

Because the generally prevailing local billing rate is considerably lower than the forum rate, the parties agree that the *Davis County* exception applies, and therefore the local rate rather than the prevailing forum rate should be applied herein. Opp. at 19; Reply at 8. They simply disagree as to the appropriate local rate.

Both parties filed evidence in support of their competing views as to the proper local rate. Ms. Gonzalez seeks fees calculated on the basis of an hourly rate of $300 to $325 per hour depending on when the work was performed. Fees Pet. at 2. In support of that rate, Petitioner has submitted the *United States Consumer Law Attorney Fee Survey Report 2013-2014*, pointing to the New Jersey rates set forth therein. Reply at 8 (citing Pet'r's Ex. 16 at 70). Petitioner has also filed affidavits from two attorneys practicing in Atlantic County, New Jersey, "attest[ing] to the reasonableness of [P]etitioner's [counsel's] fees based on [her] number of years [of] practice and [her] knowledge and experience." *Id.* at 8 (citing Pet'r's Exs. 17 and 18). Petitioner attempts to bulwark the reasonableness of the requested rate by pointing out that counsel consistently charged $300 per hour from 2010 until 2014, and (applying the recession trend five-year average from the RRR filed by Respondent) the sum should by now have increased to $344.10 – higher than the $325 rate she has actually been charging. *Id.* at 7-8.

Respondent questions the persuasiveness of the documentation submitted by Petitioner in support of her rate request. ECF No. 28 at 1-2. Thus, Respondent notes that in *Mooney v. Sec'y of Health & Human Servs*, No. 05-266V, 2014 WL 7715158, at *3 n.9, *5 (Fed. Cl. Spec. Mstr. Dec. 29, 2014), another special master questioned the reliability of the Fee Survey Report in Vaccine Program cases. Reply at 2 (quoting *Mooney*, 2014 WL 7715158, at *5). Respondent similarly questions whether the affidavits offered reflect the self-interested views of practitioners with no demonstrable Vaccine Program experience, rather than clear-eyed, independent analysis of the proper rate for Ms. Gallagher. *Id.* (citing *Masias*, 2009 WL 1838979, at *27).

Respondent suggests the appropriate hourly rate for Ms. Gallagher is $184 per hour as of 2015. Opp. at 21. In support of this argument, she relies on the RRR, a Datacert/Tymetrix publication (Resp't's Ex. A). The RRR is described as "the industry's leading data-driven benchmark report for attorneys rates and matter costs," and is based upon more than $16 billion in legal spending data derived from data maintained by law firms and corporations alike. *Id.* at 5. Respondent cites the RRR particularly for her presumption that the size of a law firm is "the biggest driver" of law firm rates, with bigger law firms commanding higher rates without regard to their market location or the type of work performed. Opp. at 20.

Applying the above, Respondent's opposition explains how she derived her proposed hourly rate. Because the location of Ms. Gallagher's office in Linwood, New Jersey (Atlantic County) was not reflected in the RRR, Respondent looked at attorney hourly rates in New York City for attorneys comparable to Ms. Gallagher (those working in small firms with fewer than 50

attorneys performing general liability litigation) and then calculated an hourly rate by making adjustments based on cost of living, using the May 2013 edition of *The Real Costs of Living in New Jersey*, which was published by Legal Services of New Jersey. *See* Resp't's Ex. B; Opp. at 20 (citing Resp't's Ex. A at 174). Based upon a 2013 mean rate of $259 per hour for comparable small-firm New York City attorneys, and discounted by 30 percent to adjust for costs of living differences, Respondent arrived at $181 per hour – which, adjusted for inflation based upon the CPI inflation calculator, results in a rate of approximately $184 per hour for 2015. Opp. at 20-21.[16]

Although there is some logic to Respondent's analysis, I find it lacking in several respects. In particular, I do not concur that the RRR is particularly reliable in calculating an attorney's proper hourly rate. *See generally McCulloch v. Sec'y of Health & Human Servs.*, No. 09-293V, 2015 WL 5634323, at *8-10, *14 (Fed. Cl. Sept. 1, 2015) (criticizing use of the RRR as a basis for calculating hourly rates for attorneys practicing in the Vaccine Program). As previously explained by Special Master Gowen in *McCulloch*, it is not self-evident that the work required of Vaccine Program attorneys is directly comparable to "general liability litigation" (as the term is used in the RRR) as assumed by Respondent. *Id.* at *9. That term is not defined in the RRR (nor does Respondent provide further explanation as to its suggested meaning). *Id.* Based on my review of the information included in the RRR (and consistent with the determination previously made by another special master), "general liability litigation" cannot be assumed to include personal injury litigation performed by a plaintiff's attorney because such work is highly specialized, typically done on a contingency basis, and is not the kind of attorney work usually performed for a corporation (which might exercise bargaining power, based on monthly billing or repeated representation of the same client in similar contexts, to negotiate a lesser rate than what the market might otherwise command in a single instance of representation). *Id.* Additionally, the term "general liability litigation" does not encompass insurance defense litigation, patents, or finance and securities, as these are other categories of litigation explicitly referenced in the RRR. *Id.*; *See* Resp't's Ex. A at 9. And as previously noted, it does not appear that the RRR data involving "general liability" litigation takes into account the kind of work performed in Vaccine Program cases, or the manner in which such work is compensated (and the demands it places on the attorneys who perform it). 2015 WL 5634323, at *9.

Considering these significant deficiencies, I do not find that a comparison between RRR data on "general liability litigation" at small firms and Ms. Gallagher's work is helpful to the

---

[16] As additional support for the reasonableness of the proposed hourly rate, Respondent relied on RRR data from Philadelphia (another metropolitan area near where Ms. Gallagher practices) indicating that there "the 2013 median rates for a partner in a small law firm (50 or fewer members) doing general liability litigation (such as Vaccine Act work) is $206.00 per hour." Opp. at 20 (citing Resp't's Ex. A at 177). Accordingly, Respondent argues that "the data for similarly-situated attorneys in the two largest metropolitan areas closest to Linwood, New Jersey, show[] rates significantly lower than the rate sought here by [P]etitioner for Attorney Gallagher, who additionally lives in an area with a much lower cost of living." *Id.* at 20. Although this contention is somewhat more persuasive than Respondent's other RRR-based arguments – given that Philadelphia is substantially closer to where Ms. Gallagher actually practices – I nevertheless find (for the reasons discussed herein) that a higher local rate is appropriate.

present analysis. I must therefore look for other, better bases for determining Ms. Gallagher's hourly rate. *Dougherty v. Sec'y of Health & Human Servs*, 2011 WL 5357816, No. 05-700, at *6 (Fed. Cl. Spec. Mstr. Oct. 14, 2011) (citing *Rupert ex rel. Rupert v. Sec'y of Health & Human Servs.*, 52 Fed. Cl. 684, 688-89 (2002)) (in Vaccine Program cases, "[w]hen the parties do not provide reliable evidence, the court can look to other evidence to establish a reasonable hourly rate").

I have found no other instances in which a special master determined the proper hourly rate for lawyers in Linwood, New Jersey (Atlantic County). Nor, as discussed above, has either side presented particularly persuasive evidence supporting the rates they propose. But there are many cases outside the Vaccine Program — in particular, civil matters from the United State District Courts in New Jersey — that provide a helpful comparative baseline. In a sample of such cases, the awarded rate has varied widely between $250 and $500 per hour, depending upon the precise locale in which the attorney practiced. *See, e.g.*, *Roccisano v. Twp. of Franklin*, No. CIV.A. 11-6558 FLW, 2015 WL 3649149, at *6 (D.N.J. June 11, 2015) ($300 was determined to be a reasonable hourly rate for attorneys at a law firm in New Brunswick, New Jersey who were partners and had been practicing law for 10 to 12 years); *Wyndham Hotels & Resorts, LLC v. Northstart Mt. Olive, LLC*, No. CIV. 10-2583 RBK/AMD, 2015 WL 1004018, at *3 (D.N.J. Mar. 6, 2015) (determining that $340.92 was a reasonable blended hourly rate for a number of attorneys with various years of experience practicing in Parsippany, New Jersey); *Bass v. Dellagicoma*, No. CIV. 10-1195 KSH, 2013 WL 3336760, at *4 (D.N.J. June 28, 2013) (finding that rates of $250 pre–2013 and $300 post–2013 were reasonable for an attorney with over five years of experience in Newark, New Jersey who recently became partner at the firm, and $500 per hour was a reasonable hourly rate for a partner at the same firm with over 30 years of experience in civil litigation); *United States ex rel. Simring v. Univ. Physician Assocs.*, No. 04–3530, 2012 WL 10033888, at *7 (D.N.J. Oct. 2, 2012), *report & recommendation adopted as modified*, 2013 WL 6628223 (D.N.J. Aug. 22, 2013) (finding an hourly rate of $450 reasonable for an attorney with 30 years of experience practicing in Montclair, New Jersey).

The range of these hourly rate determinations is plainly a function of an attorney's experience but also of location, since the cases allowing fees calculated at the highest rates involve experienced counsel who practice in a town or community in the immediate New York City metropolitan region. An attorney practicing immediately outside of New York City will likely be able to command a higher rate than one working in the Philadelphia vicinity, while all other practitioners in the Garden State will see a greater drop-off.

Ms. Gallagher is an experienced Vaccine Program practitioner. In addition, the rate she requests is facially modest by most definitions, and her experience notable enough to justify an hourly rate close to what Petitioner seeks. However, I find that some reduction is appropriate when I compare her requested rates to comparably experienced New Jersey attorneys who do not practice

in the immediate New York City metropolitan area. I also take into account the parties' concurrence (which I share) that the *Davis County* exception applies, and the forum rate should not govern the fees award. I therefore find, based on my discretion and the foregoing analysis, that $315 an hour is an appropriate rate for her for work performed in this case in 2015.

That current rate, however, cannot be applied retroactively to work done in previously years, as doing so would effectively be the equivalent of charging the government interest. *Hocraffer v. Sec'y of Health & Human Servs.*, No. 99-533V, 2011 WL 3705153, at *17-19 (Fed. Cl. Spec. Mstr. July 25, 2011). As a result, employing the Bureau of Labor Statistics' CPI inflation calculator,[17] and based upon the latest monthly index value, $315 in 2015 has the same buying power as $313.40 in 2014. *See generally* CPI Calculator. Accordingly, the adjusted range for work performed in 2014 is $313.40 per hour.

C.    *Attorney Hours Spent on Litigation*

Respondent next asserts that the total number of hours billed by Ms. Gallagher in this matter should be reduced because they were excessive, unreasonable, and/or in the nature of paralegal work. Opp. at 22-25. Petitioner argues the opposite. Reply at 7-9.

A Vaccine Act petitioner should be compensated only for hours "reasonably expended" on the litigation. *Carrington v. Sec'y of Health & Human Servs.*, 85 Fed. Cl. 319, 323 (2008) (quoting *Hines on Behalf of Sevier v. Sec'y of Health & Human Servs.*, 22 Cl. Ct. 750, 754 (Apr. 2, 1991)). Accordingly, the Court must exclude those "hours that are excessive, redundant, or otherwise unnecessary." *Hensley v. Eckerhart*, 461 U.S. 424, 434 (1983). Quoting a decision by the United States Supreme Court, the Federal Circuit has characterized the contours of a reasonable fees request:

> The [trial forum] also should exclude from this initial fee calculation hours that were not "reasonably expended." . . . Counsel for the prevailing party should make a good-faith effort to exclude from a fee request hours that are excessive, redundant, or otherwise unnecessary, just as a lawyer in private practice ethically is obligated to exclude such hours from his fee submission. "In the private sector, 'billing judgment' is an important component in fee setting. It is no less important here. Hours that are not properly billed to one's client also are not properly billed to one's adversary pursuant to statutory authority."

*Saxton v. Sec'y of Health & Human Servs.*, 3 F.3d 1517, 1521 (Fed. Cir. 1993) (quoting *Hensley*,

---

[17] The Government's Inflation Calculator determines the average CPI for a given calendar year. CPI Inflation Calculator, U.S. Bureau of Labor Statistics, http://www.bls.gov/data/inflation_calculator html (last updated April 15, 2014) ("CPI Calculator"); *see also Impresa Construzioni Geom. Domenico Garufi v. United States*, 100 Fed. Cl. 750 (2011) (employing CPI Calculator to determine whether cost of living had risen following the passage of the Equal Access to Justice Act). The data upon which the calculation is based reflect yearly changes in prices of all goods and services purchased for consumption by urban households.

461 U.S. at 433-34). Similarly, tasks that could be efficiently delegated to an individual who charges a lower hourly rate than the attorney (for example, a paralegal or even a secretary) should not be billed at the attorney's hourly rate. *Brown v. Sec'y of Health & Human Servs.*, No. 09–426V, 2012 WL 952268, at *7 (Fed. Cl. Spec. Mstr. Feb. 29, 2012) (quoting *Riggins v. Sec'y of Health & Human Servs.*, No 99-382V, 2009 WL 3319818, at *25 (Fed. Cl. Spec. Mstr. June 15, 2009)) ("[i]f counsel elects to have an attorney perform [clerical] activities, it is in counsel's discretion. However, the time spent by an attorney performing work that a paralegal can accomplish should be billed at a paralegal's hourly rate, not an attorney's").

Attorney billing records (which should set forth specific information about the date and nature of attorney tasks performed on a given case) can be used when determining the reasonableness of the amount of time spent on litigation. *See Guidelines for Practice Under the National Vaccine Injury Compensation Program* (Office of Special Masters, United States Court of Federal Claims, Rev. Ed. Nov. 2014) Section XIV.A.3 at 19. It is within the special master's discretion to reduce the number of hours by a percentage of the amount charged, rather than making a line-by-line determination regarding the reasonableness of the charges. *Saxton*, 3 F.3d at 1521-22 (approving the special master's elimination of 50 percent of the hours claimed); *see also Broekelschen v. Sec'y of Health & Human Servs.*, 102 Fed. Cl. 719, 728–29 (2011) (affirming the special master's reduction of attorney and paralegal hours); *Guy v. Sec'y of Health & Human Servs.*, 38 Fed. Cl. 403, 406 (1997) (affirming the special master's reduction in the number of hours from 515.3 hours to 240 hours); *Edgar v. Sec'y of Health & Human Servs.*, 32 Fed. Cl. 506 (1994) (affirming the special master's awarding only 58 percent of the numbers of hours for which compensation was sought). At bottom, as the Supreme Court instructs, when awarding attorney's fees, special masters may use estimates to achieve "rough justice." *Fox v. Vice*, 131 S. Ct. 2205, 2216 (2011).

1.   Pre-Filing Research - Respondent first objects to the amount of time Petitioner's counsel spent researching this case. Opp. at 23-24. According to Respondent, "[g]iven the facts of this case, to what end most of the research was done is not apparent" and, as such, this time should be significantly reduced. *Id.* at 23-24. The records submitted with the fees petition reveal that counsel spent approximately 8.6 hours in the eleven months before the matter was filed considering the merits of the claim, based on evaluation of the medical records plus the initial research into the scientific and medical viability of the claim as discussed above. ECF No 25-3 at 2-6.[18] This amount of time is not notably excessive for the average Vaccine Program case. However, despite the fact that I have determined that the case had a reasonable basis for filing, I

---

[18] Respondent filed an annotated version of the billing records from Ms. Gallagher which attempts to break down the hours that she spent working on this case into six general categories: medical record review, general review, client communication, paralegal work, time spent on research, and time spent on procuring fees and costs. ECF No. 25-3. I have reviewed Respondent's breakdown of the billing record, but have used my own interpretation of the billing record when making determinations regarding the amount of time spent on particular types of tasks (and correspondingly to determine appropriate reductions to time spent on certain tasks). As such, my calculation of the number of hours spent on various categories of tasks does not always precisely match the calculations made by Respondent.

am somewhat troubled by this figure. Counsel has not demonstrated that she could not have, with a bit more initial diligence, made the determination that led her to dismiss the case at an earlier point in time. Indeed, given the novelty of the claim pursued, her initial work on the matter would have been better applied to considering the medical and scientific basis for the claim first, and/or consulting with an expert closer to the filing date. Although this might place more of an onus on counsel (since she would run the risk that her efforts would not be compensated), the whole point of the reasonable basis analysis is to discourage counsel from gaming the system by filing first and asking questions later.

Thus, although I have found the case had sufficient reasonable basis for its filing, I also find that under the circumstances counsel should not receive reimbursement for all of her pre-filing activities (which would not have been reimbursed had the case not been filed in the first place). I therefore reduce these hours by approximately fifty percent, or by 4.3 hours.

2. _Paralegal Tasks_ - Respondent next argues that some of the time Petitioner's counsel spent procuring medical records, and communicating with Ms. Gonzalez, "is in the nature of paralegal work" and, as such, should be billed at a paralegal hourly rate rather than Ms. Gallagher's attorney billing rate. Opp at 23. In response, Petitioner asserts that, as Respondent is aware, Ms. Gallagher does not employ a paralegal (Reply at 8) – but this fact does not justify awarding fees for activities that could have been performed by a paralegal or secretary, as has been recognized repeatedly by other special masters (_see, e.g._, _Brown_, 2012 WL 952268, at *7 (quoting _Riggins_, 2009 WL 3319818, at *25)).

I concur with Respondent that certain time billed in this matter should not be compensated at Ms. Gallagher's attorney billing rate. Based on my review of the submitted materials (including Ms. Gallagher's billing records), as well as my discretion in determining attorney's fees issues, some of the hours expended by Ms. Gallagher talking with Petitioner, reviewing medical records, and conducting research regarding the claim in this case appear to be reasonable, but 15.95 hours were spent performing tasks that would have been more appropriately performed by a paralegal. Accordingly, 15.95 hours of counsel's time should be reimbursed based on a reasonable paralegal hourly rate.

Accordingly, I must determine the hourly rate for a paralegal working in Southern New Jersey. Reasonable paralegal fees are calculated using the same lodestar method applicable to attorney's fees. _See Dunham v. Sec'y of Health & Human Servs._, 18 Cl. Ct. 633, 641 (1989). The parties have not provided information regarding what constitutes a reasonable hourly rate for a paralegal working in New Jersey, and I have found no other instances in which a special master determined the proper hourly rate for paralegals in the Linwood, New Jersey (Atlantic County) area. But in a sample of federal cases outside of the Vaccine Program, the awarded rate for paralegals in the relevant region has varied between $75 and $90 per hour. _See, e.g._, _Bilazzo v._

*Portfolio Recovery Associates, LLC,* 876 F. Supp. 2d 452, 471 (D.N.J. 2012) (finding $80 per hour to be a reasonable hourly rate for a paralegal in New Jersey); *see also Osterweil v. Bartlett*, No. 1:09-CV-825 MAD/CFH, 2015 WL 1066404, at *16 (N.D.N.Y. Mar. 11, 2015) (awarding a paralegal practicing in Woodbridge, New Jersey an hourly rate of $80 based on the prevailing hourly rates in the forum, the Northern District of New York); *Fundora v. 87-10 51st Ave. Owners Corp.*, No. 13-CV-0738 JO, 2015 WL 729736, at *1 (E.D.N.Y. Feb. 19, 2015) (awarding a paralegal rate of $75 per hour based on the prevailing hourly rate in the Eastern District of New York); *Trustees of Metal Polishers Local 8A-28A Funds v. Superiro Scaffolding Servs. Inc.*, No. 12-CV-4251 ARR RML, 2013 WL 4095495, at *4 (E.D.N.Y. Aug. 9, 2013) (awarding a paralegal rate of $90 per hour in the Eastern District of New York).

Based upon the above, I find that Ms. Gallagher should receive a rate of $80 per hour for time spent performing tasks that could have been accomplished by a paralegal. Accordingly, Ms. Gallagher will be compensated for 15.95 hours of work performed on this case at a paralegal rate of $80 per hour.

D.      *Fees From Litigating Fees Dispute*

Respondent further objects to a component of attorney time she categorizes as dedicated to fees issues generally in June of 2015. Opp. at 24. While Respondent lodges global objections to these hours, she in effect raises two distinct objections.

First, Respondent asserts that time devoted to the briefing of this fees dispute was excessive "given the simplicity of the case." Opp. at 24. This objection is without merit. Vaccine Act petitioners are generally entitled to compensation for time spent by their attorneys preparing applications for attorney's fees and costs, provided that the amount of time spent was reasonable. *Hocraffer*, 2011 WL 3705153, at *5; *Torday v. Sec'y of Health & Human Servs.*, No. 07–372V, 2011 WL 2680687, at *3-4 (Fed. Cl. Spec. Mstr. Apr. 7, 2011). The special master's own experience, as well as comparisons to the amount of time that attorneys have spent on similar tasks in other cases can be utilized when making determinations regarding whether the time expended on a fees motions was reasonable. *Hocraffer*, 2011 WL 3705153, at *20; *see also Torday*, 2011 WL 2680687, at *3 (special circumstances may warrant an attorney spending more time on a task than is typically spent on that task by attorneys in other cases). Billing less than three hours for the preparation of a fees petition, after failing to successfully negotiate the matter with Respondent, is not excessive, even though this case was dismissed.

Second, Respondent argues that the remainder of the hours incurred prior to the filing of the present application, and aimed at assembling a record of Ms. Gallagher's total bill so that it could be negotiated with Respondent's counsel (Resp't's Ex. C at 11), is not compensable because it is "indistinguishable of a client, preparing the invoice and assembling receipts," and therefore an attorney task that would not ordinarily bill to a client. Opp. at 24. In so objecting, Respondent

acknowledges that other special masters have paid the fees associated with such work in the past, but persists in her objection that I should disregard such nonbinding precedent. *Id.*

Respondent's second objection has a better foundation. Counsel are to be encouraged in attempting to negotiate fees with Respondent rather than simply moving for their award (and thus inviting dispute), and to do so clearly requires counsel to provide to Respondent's counsel a record of the fees and costs to be claimed. However, the act of negotiating the sum should not take an excessive amount of time (especially where a case has been dismissed promptly, like the present matter). Here, Petitioner's counsel has billed 2.35 hours for this process. While such an amount is facially modest, I concur with Respondent that some reduction is appropriate (especially since the billing record does not distinguish between time spent negotiating the sum and time spent discussing it with Respondent). I therefore deduct 1.35 hours from this time.

E.    *Expert Costs*

Respondent objects to the $2,500 charged by Dr. Axelrod to review this case, questioning both his hourly rate plus the amount of time he spent on the matter. Opp. at 25. According to billing invoices submitted by Petitioner, Dr. Axelrod charged $500 per hour for his work on this case, billing: (a) 2 hours for review of M. A-S. M.'s medical records (chart review), (b) 2.5 hours for research, and (c) 0.5 hours for preparation of a report. ECF No. 24-2 at 5 (invoice dated Apr. 12, 2015).

Vaccine Program petitioners are entitled to reimbursement for costs that were reasonably expended during the course of the litigation, including expert-related costs. *Perreira*, 27 Fed. Cl. at 34 (indicating that the "reasonableness" requirement applies not only to requests for reimbursement of attorney's fees but also to any request for reimbursement of costs). The burden of demonstrating that costs incurred were reasonable falls on the petitioner. *Ceballos v. Sec'y of Health & Human Servs.*, No. 99-97V, 2004 WL 784910, at *13 (Fed. Cl. Spec. Mstr. Mar. 25, 2004) (quoting *Comm. Heating & Plumbing Co. v. Garrett III*, 2 F.3d 1143, 1146 (Fed. Cir. 1993)). The special master can exercise broad discretion in evaluating the reasonableness of requested expert costs. *Perreira*, 27 Fed. Cl. at 34; *Chen Bou v. Sec'y of Health & Human Servs.*, No. 04-1329V, 2007 WL 924495, at *7 (Fed. Cl. Spec. Mstr. Mar. 9, 2007).

As with attorney's fees, the lodestar method is utilized to calculate what constitutes a reasonable fee for an expert in a Vaccine Program case. *Simon v. Sec'y of Health & Human Servs.*, No. 05–941V, 2008 WL 623833, at *1 (Fed. Cl. Spec. Mstr. Feb. 21, 2008). Accordingly, to calculate reasonable expert costs, the number of hours reasonably expended by the expert[19] is

---

[19] The special master's own experience and judgment, as well as the amount of time that an expert with comparable skills would have spent on the task in a comparable case, are relevant considerations when making determinations regarding the number of hours reasonably expended by an expert on a case. *Caves v. Sec'y of Health & Human Servs.*, No. 07–443V, 2012 WL 6951286, at *12 (Fed. Cl. Spec. Mstr. Dec. 20, 2012), *mot. for review den'd*, 111 Fed. Cl. 774 (2013).

multiplied by a reasonable hourly rate. *Simon*, 2008 WL 623833, at *1. The petitioner bears the burden of demonstrating the reasonableness of the expert's hourly rate and the reasonableness of the number of hours that the expert expended on the case. *Id.* at *2. A special master may decline to award compensation for expert related costs where the petitioner fails to provide a sufficient explanation of the work performed by an expert or that expert's qualifications. *See Doe v. Sec'y of Health & Human Servs.*, No. 02-411V, 2011 WL 6941671, at *8 (Fed. Cl. Spec. Mstr. Oct. 26, 2011).

An expert retained by a petitioner in a Vaccine Program case will be compensated only at a reasonable hourly rate. *Perreira*, 27 Fed. Cl. at 34. In determining whether the hourly rate is reasonable, the special master may consider "the witness's area of expertise; the education and training required to provide him the necessary insight; the prevailing rates for other comparably respected available experts; the nature, quality, and complexity of the information provided; the cost of living in the expert's geographic area; and any other factor likely to assist the undersigned in balancing the various interests in the case." *Baker v. Sec'y of Health & Human Servs.*, No. 99–653V, 2005 WL 589431, at *3-5 (Fed. Cl. Spec. Mstr. Feb. 24, 2005), *mot. for review den'd*, 2005 WL 6122529 (Fed. Cl. June 21, 2005).

The first issue to resolve is the appropriateness of Dr. Axelrod's requested hourly rate. Respondent argues that Ms. Gonzalez has not adequately established $500 as a reasonable hourly rate for Dr. Axelrod's services. Opp. at 26. To that end, she observes that as recently as 2011, Dr. Axelrod charged $350 per hour for his services, a sum that (even accounting for inflation) would have risen to only $370 in 2015. *Id.* (citing Resp't's Ex. E (a screenshot from Dr. Axelrod's website taken in November of 2011 indicating that his hourly rate was $350 per hour)).

One way of evaluating the reasonableness of the requested rate is to consider Dr. Axelrod's credentials. According to information from his website, Dr. Axelrod is a clinical immunologist, board certified in allergy and immunology, rheumatology, medical laboratory immunology, and internal medicine who has been involved in the diagnosis and management of patients with immune illness in both academics and private practice for over 30 years. Resp't's Ex. D (ECF No. 25-4 at 1) at 1. He is licensed to practice in multiple states, is a member of a number of professional organizations, and has published articles on a variety of topics. ECF No. 30. Dr. Axelrod's website also notes that he has provided expert opinions in many Vaccine Program cases (although in Respondent's view, this fact cuts against him).[20] Resp't's Ex. D. Accordingly, Dr. Axelrod has the kind of qualifications an expert in the Vaccine Program should possess.

---

[20] For this reason, Respondent argues that Dr. Axelrod is an interested witness who consistently advocates for petitioners in the Vaccine Program without regard to the substance of their claim. Opp. at 25-26. Petitioner, however, aptly rebutted the notion that Dr. Axelrod was such a partisan in this particular case – since if that were so, he would have merely prepared an expert report instead of offering the opinion that the matter should be dismissed. Reply at 9.

I have found no other instances in which a special master determined the proper hourly rate for Dr. Axelrod. *But see Vogler v. Sec'y of Health & Human Servs.*, No. 11-424V, 2013 WL 1635860, at *3 (Fed. Cl. Mar. 24, 2013) (finding that the petitioner failed to provide sufficient evidence to justify pre-approval of an hourly rate of $500 for Dr. Axelrod). However, there are many Vaccine Program cases that provide some context as to what might constitute a reasonable hourly rate for a qualified expert, reimbursing expert costs based on a rate in the range of $350 to $500 per hour. *See, e.g.*, *O'Neill v. Sec'y of Health & Human Servs.*, No. 08-243V, 2015 WL 2399211, at *17 (Fed. Cl. Spec. Mstr. Apr. 28, 2015) (awarding an hourly rate of $400 to an expert in neurology); *Dingle v. Sec'y of Health & Human Servs.*, No. 08-579V, 2014 WL 630473, at *8 (Fed. Cl. Spec. Mstr. Jan. 24, 2014) (expert did not have "specialized knowledge and experience" in the case to justify his requested hourly rate of $500 and, accordingly, rate was reduced to $400 per hour); *Allen v. Sec'y of Health & Human Servs.*, No. 11-051V, 2013 WL 5229796, at *2 (Fed. Cl. Aug. 23, 2013) (pre-approving a rate of $500 per hour for an expert in neurology and immunology and who also had expertise in a pertinent area to the issue in the case); *Chen Bou*, 2007 WL 924495, at *10, *16 (awarding an expert a rate of $350 per hour based in part on his poor performance in testifying at hearing, but noting that "[b]ased upon the information submitted [], with the appropriate set of facts the undersigned would have no issue with awarding the $500 requested by petitioner").

In this case, I find that the proper rate for Dr. Axelrod should be a function not only of his personal expertise, but also the nature of the work he performed herein and its impact on the case's resolution. Although he did minimal work on this matter, it cannot be denied that he was particularly effective, as he persuaded Petitioner not to proceed with the case – thereby saving time, money, and judicial resources. Nevertheless, Respondent correctly points out that Petitioner has for her part offered little evidence to substantiate the requested $500 hourly rate.[21] I therefore will slightly discount Dr. Axelrod's rate to $450 an hour, to reflect the fact that the complexity of the medical and scientific issues presented does not justify a higher hourly rate for his services.

The same analysis cuts against Respondent's assertions that Dr. Axelrod devoted too much time to the matter given the fact that the case was dismissed. Experts in Vaccine Program cases are routinely awarded fees even where the petitioner is unsuccessful. *See, e.g.*, *Mooney*, 2014 WL 7715158, at *12. However, some small portion of Dr. Axelrod's time (.5 hours) analyzing the records could have been spent more efficiently given the nature of the issues in dispute. Similarly, I will discount time spent researching the matter by .5 hours, since his higher hourly rate presumes

---

[21] I also note that the work performed by Dr. Axelrod appears to have been consultative in nature, which does not involve the same tasks a testifying expert must undergo or prepare to perform, and therefore could also make a lower rate appropriate. *See, e.g.*, *Mooney v. Sec'y of Health & Human Servs.*, No. 05-266V, 2014 WL 7715158, at *13 (Fed. Cl. Spec. Mstr. Dec. 29, 2014) ("[e]xpert consultants play an important role in aiding counsel to understand complex scientific and medical questions even if they may not be qualified to offer an expert opinion or if other factors make appearance as a witness problematic"). Here, Dr. Axelrod did not file an expert report (and spent minimal time in its preparation), and also never needed to testify. While I do not find that the fact that Dr. Axelrod only consulted in this matter is strong grounds for reducing his requested rate, I do find it a relevant consideration.

a degree of expertise that should make extensive research unnecessary. Accordingly, I award expert costs in the amount of $1,800 ($450 per hour x 4 hours).

      F.    *Other Costs*

Respondent has not objected to the $751.54 in costs that Petitioner requested (which represent the $400 petition filing fee and $351.54 associated with obtaining medical records relevant to Petitioner's claim in this case). Respondent has similarly not objected to $437 in unreimbursed costs requested by Petitioner. I have reviewed these costs and determined that they are reasonable. Accordingly, I award Petitioner the full amount she requested for these costs.

## CONCLUSION

For the reasons stated above, I hereby GRANT IN PART and DENY IN PART Petitioner's application for attorney's fees and costs in this case. Based on all of the above, the following chart sets forth the total calculation of Petitioner's fees and costs award:

| Contested Sum | Amount Requested | Reduction | Total Awarded |
|---|---|---|---|
| Ms. Gallagher's Fees | $30,198.75 | $5,984.77 | $24,213.98 |
| Dr. Axelrod's Fees | $2,500 | $700 | $1,800 |
| Other Costs Paid by Ms. Gallagher | $751.54 | $0 | $751.54 |
| Petitioner's Unreimbursed Costs | $437 | $0 | $437 |

I reduce Petitioner's fees application by the amount of $6,684.77, thereby awarding Petitioner a total of $27,202.52. This amount reflects the total amount awarded for Petitioner's application for attorney's fees and costs, and includes the supplemental motion seeking fees associated with litigating this dispute. Accordingly, an award shall be made in the form of a check jointly payable to Petitioner and Petitioner's counsel, Carol L. Gallagher, in the amount of $27.202.52.

In the absence of a motion for review filed pursuant to RCFC Appendix B, the clerk of the Court **SHALL ENTER JUDGMENT** in accordance with the terms of this decision.[22]

**IT IS SO ORDERED**.

/s/ Brian H. Corcoran
Brian H. Corcoran
Special Master

---

[22] Pursuant to Vaccine Rule 11(a), the parties may expedite entry of judgment if (jointly or separately) they file notices renouncing their right to seek review.